Case number 14-1206, the American Coal Company Petitioner v. Federal Mine Safety and Health Review Commission and Department of Labor. Mr. Harden for the petitioner, Mr. Feingold for the respondent. Good morning. I've reserved two minutes for rebuttal. May it please the court, my name is Jason Harden and I represent the petitioner, the American Coal Company. This case concerns the definition of fire as used in the definition of accident in Section 3K of the Mine Act, as that term is applied in Section 103K of the Mine Act. Section 103K grants the Secretary of Labor and his inspectors broad authority to issue control orders at one of the nation's many mines when an accident, quote, is occurring. It's undisputed that Congress enacted Section 103K to respond to accidents. So the question is, what was the accident here? Was it cold January morning in 2010? Is smoldering combustion itself a source of danger? Stay away from the definition of mine fire just for a second. We'll get to that. I realize the case is about that. But just for my understanding, is a smoldering combustion, whatever you want to call it, is that itself an independent source of danger to workers? It could be. It could be, Judge, depending on the circumstances, absolutely it could be in a mining context. But the question is, was it? But your argument is that Congress didn't intend to be that broad. It intended to identify a situation where there was a flame. Well, this case isn't about the meaning of the term accident. This case is about the meaning of the term fire as stipulated by the parties. Which is surprising to me that it is not about the term accident. I mean, we have a Chenery problem here. It's just stunning to me that that would not be what this case is about. I have no idea why the Commission chose to argue this case so narrowly, but you're right. And that's the point, is that under the penumbra of accident, we would admit that smoldering, given the circumstances, perhaps an underground situation in a confined space, could be an accident. But not a fire. But not a fire. And that's what this case is about. But why isn't it a mine fire? I found your argument a little bit, maybe I didn't understand it, that we can't look at the word mine. No, you can. I mean, our argument is not that you can look at the word mine. The bigger point is that the Secretary didn't really even raise it until this appeal, but it's the term fire as used in the Mine Act. And the Secretary has said with the mandate of safety and health, that is what expands fire. Do you acknowledge that the phrase mine fire might be different than the word just fire? That mine adds a context here that might make it different? Your Honor, that's correct. And I would say that Section 3K does say the phrase mine fire. But the Secretary here has chosen to interpret the phrase fire. And if you go back and look at all of the statements before the administrative law judge and on the initial appeal before the commission, the Secretary interpreted the word fire. And, in fact, even in their briefing here, they admit that a mine fire is a fire in a mine. And mine is defined specifically in Section 3 of the Mine Act. It's also defined there. So it's a fire in a mine. Now, it's also defined in the context of the Mine Act, and we don't get around that. But the point is, is can the Mine Act or the word mine change? Your argument, this wasn't in a mine. This was outside the mine. I mean, the surface stockpile is part of the mine. There's no question. But the fact is that here, this was a large, isolated coal stockpile on the surface, not in a confined space, no flames, no glowing embers, no carbon monoxide. But smoke. And I'm going to resist the temptation to say where there's smoke, there's fire. But there's smoke, right? Well, and there was whitish smoke, which is telling in and of itself. I mean, what does white smoke mean? I mean, some of the – What does it mean? I can't remember. Is it dark smoke or what? A new poem. Well, you know, and the question is, is there smoke or is there fire? And the question is, if that's what the Secretary's interpretation was, then why didn't they say that? They didn't. And that's because where there's smoke, there's not always fire. Where there's flames, there is always fire. There is a thing called pre-combustion, which I think is not without – it's defined in some of the dictionaries. It's talked about in some of these treatises where there is no combustion going on, but coal self-heats and emits a whitish smoke. Mr. Herndon, can you tell us a little bit more about that? You talk about the self-heating coal piles. What's going on then? How common is it? What determines whether it's going to continue and develop or does it dissipate on its own? Well, that's one of the things that we've outlined in our briefing. And, in fact, one of the references in our addendum goes back almost 100 years, talking about the self-heating of coal. Even then, I think as long as coal has been mined and put in a pile, people have known that it has the ability to self-heat. Now, that doesn't mean it's always going to catch on fire. In fact, even in your own backyard when you light charcoal, which has wood in it to help it burn, you often have to put on lighter fluid to actually make it burn. It often doesn't. But it does have the ability to self-heat. And I think as the Secretary's materials and AMCO's materials make clear, it can often self-heat for months without ever combusting into smoldering or into flaming combustion, and it can still emit smoke in those circumstances. I know that you've identified it as a phenomenon, but can you tell us a little bit more about what's going on chemically and why that happens? Well, the issue is should that type of a – I guess the question is, is the self-heating of coal by itself, is that a fire for purposes of a mine? That wasn't really what I was asking. I was asking just sort of a more basic question, a less tendentious question, just if you could help us understand why something that's an organic compound, that's lying on the ground, that doesn't – I mean, where is the energy coming from and why is it – Well, I think that it's long been known that if you pile and studied all over, that if you can pile a bunch of organic material on top of each other, it oftentimes can self-heat. And I'm not a chemist. I can't tell you what the process is, but I think it's known and studied that organic materials, including coal, which are piled up, can at times self-heat. And then the question becomes, in this case, is does that rise to the level of a fire for purposes of an accident as applied to Section 103K of the Mine Act? And I think this case, you can't look – you can't forget about where this was. This was a surface coal stockpile. It wasn't underground. It poses a different hazard than smoldering or pre-combustion or self-heating of coal underground. This is – there are thousands of stockpiles on the surface around the country, and AMCO is unaware of any situation before this in the past 30 years of enforcement of the Mine Act where the MSHA or its inspectors issued a Section 103K order when there was simply smoke on a pile. When you talk about subcritical heating, what's the critical referring to? Well, the critical is the moment when it combusts. So subcritical heating means the heating before combustion. And so the point that I – the point here is that there's really three stages of self-heating of coal to a fire. One is pre-combustion. That's what's subcritical. The next would be it combusts, and it could be smoldering. And then the next would be when – if and when the smoldering erupts into flames. And, again, the question is, should the secretary be able to read the definition of fire to include all of these activities or potentially encompass all of those by finding ambiguity in the phrase fire? I can ask them, but it might – but it seems like what they're saying is not subcritical heating, yes, smoldering and flames. And you're saying no, not subcritical heating or smoldering, yes, flames. Well, I would say, again, where there's flames, there's always fire. Where there's smoke, there could be fire. And the point is the unambiguous term fire, as defined, as the Supreme Court has said, should be defined according to its plain, ordinary, contemporary meaning at the time of the passage of the Mine Act, is flames or some other visible light emitted along with heat. And you don't need to even get to all these things encompassed. Congress didn't – they could have defined fire in the statute, and they didn't. They could have directed the secretary to rule-make on the definition of fire, and they didn't. And for 30-plus years, this existed. The word fire existed over 20 times in the Mine Act, over 100 times in the secretary's regulation, and was applied just fine. AMCOL is not asking for a change, for a change in the way things have been enforced. They're not asking to decrease miner safety and health. The secretary has some references in his brief to cases that predate the enactment of the Mine Act and that talk about smoldering as a form of fire. Well, in those cases, as I think we said in our briefing, all of those cases actually – the issue before the court in all of those instances was not whether smoldering was part of the definition of fire. And, in fact, all of those cases dealt with flaming combustion at some point. So there was flames present. So they may have made an offhand remark about that, but that doesn't mean that the court actually addressed the question. The cases cited in our briefs, however, by contrast, did in fact deal with the issue is what is included in the term fire. And in that case, they were like flames, which makes a simple demarcation for the point of an accident. I mean, I think one of the most telling pieces of evidence is Inspector Crick's testimony. He believed that the hazard was a miner falling into a void or a fire, quote, is basically what the accident would have been. In other words, there was no fire and no accident occurring, but it could have. And that's inappropriate for Section 103K. It's more appropriate for an imminent danger order. Or he's using, he's conjugating his verbs a little bit incorrectly, as some people do. Would have been meaning what was in the past. But I take the ambiguity that you find there. He's saying this is a conjecture, this is a pre. I mean, one way that you're reading it is this is a pre-accident situation of potential risk. And we're trying to shoehorn it into accident so that we can treat it and sustain the decision. Well, that may be true, but if you read his entire testimony, he uses the word could several times. I don't think he was bothered by what was happening. He was bothered by what could have. And there are more arrows in the Secretary's enforcement quiver than just the most extreme Section 103K control order. I see my time is up. Mr. Harden, it seems to me that one of the things that you said was that what was happening here was pre-combustion. That is to say that there was not combustion at this point. If there was combustion, smoldering might be the result, correct? That is possible. Okay. And so I assume that your argument is even if it was smoldering, it wouldn't be a fire. Well, yes. And that's an interesting question, is the emission of light and heat, is that a fire? And I think that the most easiest definition, and it's been applied for 30 years, is that when there's flames, there's fire. And so could some types of events of smoldering be classified as a fire? Maybe, but I don't think that falls within the ordinary common meaning of the term fire. And I think it might. Again, we're not foreclosing that in an accident in certain circumstances underground, smoldering might be an accident under Section 103K. Well, one of the reasons that I ask that is that ultimately we're talking about safety of miners and we're talking about mine fires, right? And so if the definition of fire requires flame, then would the definition of mine fire require flame? Because even you acknowledge it would be different underground and smoldering might be quite dangerous. That's correct. And so that's why I'm trying to understand. I think the best, the most interesting point of this is if you look at the Secretary's own definition, the Secretary concedes that some smoldering combustion is a fire and some is not, because their part is it's flaming combustion or smoldering combustion that has the reasonable potential to burst into flames. So the Secretary himself has admitted that some smoldering is not a fire and some is. And the question is, where do you draw the line? Well, that's my question, because if both of them could be, then why would we draw the line on the other side at flame? Because you couldn't have different definitions, right? Well, the reason that I think that you can do that and it makes sense is because the common meaning usually invokes flames. But the point I think I made talking to Judge Griffith earlier is that if you say that fire requires flames, you're not decreasing miner safety and health. We're not asking for that and we're not arguing for that. Absolutely the Mine Act is there to protect miners from fires. We're asking for it to be applied consistently as it has been for 30 years. And if there is a smoldering event that poses or causes an accident, then that, given the circumstances, would fall under a similar event under Section 3K. I don't believe this court has ever addressed the issue, but I believe another circuit court addressed the issue of whether accident includes items other than those listed in Section 3K and found that it could include similar events of a similar nature. So your argument is that fire would always require flame, but somehow you could have an accident that involves something less than. That's true. In fact, I would even say that it's possible, not in this situation, but it's possible that in a situation we talked about with pre-combustion, where it's not even smoldering, but it's self-heating. If that was occurring underground in a confined space and emitting carbon dioxide and smoke, that could be an accident. It could hurt someone. It's going to be contextual. There's some amount of contextual judgment here. There is, but here's the ultimate question is can the word mine in front of fire and can the mandate of safety and health in the Mine Act create ambiguity in a term that has been plainly defined for hundreds of years? Where does it end? From my vantage point, you're overstating the clarity of the word fire. At least my thinking is your Chevron 1 argument is weak. I think you have a better Chevron 2 argument along the lines that you just made. It seems as if the Commission has acknowledged that there are some types of smoldering fire that is not a fire. It's only a type of smoldering that is reasonably probable to combust. Reasonably expected to burst into flames. I would say this. I disagree with whether or how weak the government was, but I would say this is that I believe that that raises a good point, and that was the point of Commissioner Young in dissent before the Commission, that mine operators and inspectors need to be able to anticipate and predict when a nuisance or a violation might transition to a real danger or has transitioned to a real danger. And the Secretary's interpretation here. Is that standard in your view not workable, reasonably probable to burst into flames? Absolutely not. Absolutely not. Why isn't that not workable? I think it will be applied as it was here on remand where there's smoke, there's fire. And everyone will cast aside the reasonable. And from a layperson's perspective, that doesn't sound bad, right? You look at those pictures and you see smoke and you think, you know, that's probably not good. That probably poses some danger to miners. Am I wrong about that? And it may, but, again, the question, Your Honor, is was that an accident? What is an accident? What is a fire for the purpose of an accident? There was no one injured. There was no one nearby. There was no near miss. No equipment was damaged. No lost time occurred. I mean, it was on a surface stockpile where it was emitting smoke from the self-heating of coal that occurs every day all across the surface of the mine, all across the nation. And so if you allow the Secretary's definition. So are you saying that it's the norm to have smoke rising from coal piles? It's not the norm, but it happens routinely. And for 30-plus years the Secretary didn't issue control orders. If, in fact, they thought there was a danger from that, they had another arrow in the quiver of a 107A imminent danger order that they could have issued. That's a little bit curious to me. It's like the 107A is actually in some ways a stronger medicine or at least less nuanced. You have to shut things down. It can be stronger medicine. Remove all the workers. Whereas with the accident, there's actually a lot more sort of remedial flexibility to respond in a case-specific way. So the accident here would be if one were to accept the Secretary's position, whoa, this is smoldering. It's not intentional. It's not a good thing. It's a problem that the coal pile is smoldering. This is a giant pile of fuel. Let's treat that as something that's gone wrong and respond to it. But we don't necessarily have to go all the way to 107A. Well, you don't, but you could if they protected that. But the question is, first, I don't think there was evidence showing that it was smoldering occurring. It could have been pre-combustion. I mean, there was no light and carbon monoxide detected. And so the question is, how do you prove smoldering? I mean, all of the technical treatises cited by the Secretary, which came after the Passage of the Mine Act, they all require some kind of glowing or incandescence from the smoldering. So your view is that pre-combustion, there can be smoke from pre-combustion. Absolutely, Your Honor. I think, in fact, it's in definitions of smoke will include, it says, can be from things that are pre-combustion. And that's a common meaning of smoke, and I think it's also in the technical treatises. Remind me where that is in your brief. It is in our, I'm not sure of the exact page, but it is in our brief. I think it's in the initial brief, probably under the substantial evidence section, where we talk about what should be proven for smoldering combustion. And you did not put evidence in on that issue? No, we did. I mean, we cross-examined the, we don't believe that the Secretary met his prima facie case. We don't believe that they put in any evidence of any glowing or incandescence. They didn't take any heat measurements. They didn't detect any carbon monoxide. What more evidence is there to require? Well, again, we're in a deferential posture. And remember, the only carbon monoxide detector was 60, 70 feet away. And how, I mean, often when there's smoldering, it would be under, I mean, you know, you've got these peat fires that go on for years. If you opened it up, you might see light. But who wants to require that inspectors go on the pile, dig it out, add oxygen to that situation? Well, it's interesting. That's exactly how this was, this is how this was dealt with, was they dug it out the next day and they spread it out. So that's exactly what they do is they generally just spread it out and then it goes out. So it was, you know, firefighting preparation as opposed to an inspector coming in and doing that as part of the detection. Well, they do that on a daily basis. They're monitoring their stockpile every day, and when they see smoke come up, they go out and they spread it out. I mean, this happens all over. This happens at utilities. It happens at coal mines. It happens at stockpiles along a train rail. I mean, this happens every day. And what the secretary, if you find ambiguity in the term, or if you endorse the secretary's interpretation, you could have a situation where inspection inspectors could come on to any of these sites and say, 103K order in control. And here what that means was they had to hire new people, get new equipment. They had to reduce the pile size, and the order stayed in place for six months. Six months until the judge vacated it. To follow up on that, because I'm not sure that I understand, in your view, is the 103K order, does that give the secretary more authority than the 107, or are they just different? They are different, but what it does is, and that's a great question, and the 107A is that there's an imminent danger, which means that the conditions could reasonably be expected to cause death or serious bodily harm before the condition can be abated. So they issue it, they can withdraw everyone from the site, and at that point the order's in place, but when the danger has passed, the order is removed. A section 103K stays in place until the secretary decides to lift it, or there's been an abuse of the secretary's discretion. And, again, here that stayed in place six months. Had it been an imminent danger order that day, it probably would have been lifted the next day or maybe a day after that, or maybe even later that day. I don't believe the conditions warranted an imminent danger order, but if they had, that's what would have happened. They would have spread the pile out, removed everybody, and it would have been lifted sooner. Just one last point, and I want to finish responding to your question, Judge Griffith, about Chevron Step 2, is that I think there's an argument. The secretary's interpretation could be construed as less safety promoting because as less safety promoting. I think it's really ambiguous and difficult to apply, but as I discussed earlier with Judge Brown, where do you draw the line? The secretary has admitted that some of the events covered of smoldering are not fire, and some are. The question is where is the line? I mean, and the secretary has drawn this vague. Well, we use reasonableness inquiries throughout the law. That can't be the problem, right? That's true, but I think Commissioner Young hit the nail on the head in his dissent in the commission decision when he talked about the real-world application of this definition. It's just going to be applied that where there's smoke, there's fire, or it's going to be ignored and processed. I mean, he goes into great detail on that in his dissent. Thank you. If there's no further questions, I'll see you. Thank you, Mr. Harden. Good morning, Your Honors. Good morning. On behalf of the Secretary of Labor, I'm Jerry Feingold, and with me at council table is Kristen Schuman, also of the Solicitor's Office. May it please the Court, the questions before the Court today are twofold. First, whether or not the word fire, as used in Section 3K of the Mine Act, is ambiguous as it applies to an accident under Section 103K of the Mine Act, in the sense that visible flame is either required or is not required for there to be a fire. Second, if the word fire is ambiguous, is the Secretary's interpretation a reasonable and safety-promoting interpretation that was properly given deference by the Commission and should likewise be given deference by this Court? We would ask that the Court bear in mind throughout our discussion today that the Mine Act is a remedial safety and health statute that is directed to prevent things going wrong before they go wrong and not to address them after the fact. Well, but it has to be an accident, right? It has to be an accident occurring. That's correct. So accident occurring, that sounds like it's not before the fact, right? It's to address the fire before that fire can create an injury. Before it gets worse. Exactly. But an accident has to have started. Pardon me? An accident has to be in the process of happening, right? That is correct.  That is correct. Your Honors, we know that the word fire was ambiguous with regard to whether flame was required when the Mine Act was enacted for several reasons. First, as you noted, Judge Griffith, Congress placed the modifier, the adjective, mine, in front of the word fire in Section 3K in defining accident. That is a very important point. There was no point in this litigation that anyone questioned whether we were talking about general fires or mine fires. It was mine fires from day one. A mine fire does not need to be underground, right? That is correct. No one disputes that. It can be either a coal mine or a non-coal mine. It can be a surface mine or an underground mine. That is correct. But that adjective is very important because just like certain concerns attend forest fires that are unique to forest fires and circumstantial to forest fires, similarly mine fires have circumstances that attend to them that are special because they are mine fires. So it was not being used in the general sense. We also know that the word fire was ambiguous as to whether flame was required because when Congress enacted the Mine Act and thereby extended the protections of the old Coal Act, which only applied to coal mines, to all mines in 1977, the legislative history at that time very specifically referenced the recent deaths of 91 mines. Could you address my Chevron Step 2 question? If I agreed with you that the statute is at least ambiguous as to the meaning of mine fire, I have some concerns about the way the Secretary has come up with the reasonable interpretation. How can the Secretary distinguish between smoldering that probably leads to combustion, to ignition, and smoldering that does not? Smoldering with reasonable potential. I'm sorry, reasonable potential. So the Secretary's interpretation is that smoldering itself is insufficient. It has to be a certain type of smoldering. Before we will issue an order. That's right. And this does not work. So how do you distinguish that? How is a mine operator supposed to know that that's smoldering that will probably lead to combustion and that's smoldering that's not? I mean, help me. I'm very much a layperson here. So how is the mine operator supposed to know that? Mine managers are supposed to be very well versed in the running of their mines. And if you have coal piles, you understand that fire is a hazard on a coal pile. Similarly, if you run an underground mine, you certainly realize that fire is one of the hazards you have to address. But each situation has to be addressed on its own particular circumstances. And as you, Judge Griffith, noted, the reasonable man standard is not only ubiquitous throughout administrative law, it's certainly ubiquitous throughout mine act enforcement. For instance, we have the reasonable man standard applied to numerous violations. Let me ask you, what type of smoldering would not reasonably lead to, probably lead to combustion? I can give you an example if you'd like. It's probably extreme, but I don't want to limit it to that. But an example, perhaps, might be if you have a wet parking lot at a mine site and a small pile of coal in that parking lot, and some smoke is coming off that little pile. But well-reasoned judgment would be that it would, in effect, extinguish itself. It's a very calm day. There's no wind. It would probably end up extinguishing itself before it would ever ignite into flame. And that would be a reasoned judgment. The reason we did that is because mine inspectors and mine examiners, those that work for the mine operators, have more important things to do than to worry about these relatively rare, very minor incidents where smoke is coming, but it's fairly clear it's not going to develop into anything that's a hazard. So the sense I get from you is that the typical case in which there will be smoldering on a pile is fire. In most instances, that is correct. And let me say this. If an operator, whether American or any other, in good faith, feels that they are somehow at risk because they do not have the ability to exercise this type of judgment, the answer is very simple. Just attend to all smoldering fires. So, in effect, it's exactly as Mr. Hardin has described it. The new line will be where there's smoke, there's fire. That's not true. I'm just saying if they feel that they don't have the ability to make a reasoned judgment, and remember, if they disagree with an inspector, they can do what they did here. They can take it before an administrative law judge, put on the facts, and if they're correct, the K order will be hushed. Well, here they did that, and then they still didn't win that argument. In the end, that's correct, because in this particular instance, they were incorrect based on the evidence. Are you in agreement that subcritical heating also produces smoke? I don't. I'm not an expert. I would certainly concede that's a possibility, yes. Okay. And what about, I mean, I know this is not on the record, nor is the fact that, you know, this pile burst into flame after the events in the case, but Mr. Hardin does say that, you know, this happens every day. This is all, like, all the time. You have the smoking, and they're combing out their piles, and they had to hire all these new people. Like, how is this really this quotidian kind of event, or something, and or? And maybe it is. I know mines are dangerous places. Is this something where really the alarm bells go off, people are addressing it very promptly? You know, it may happen in different places throughout the country every day. I don't know whether it does or not. But keep in mind, the only time a K order is issued is when the inspector sees it, and the inspector is not there very often. We leave it to the operators to take care of these problems. That's the whole point of the citation that went with this K order, for a failure to report it under Part 50, and the K order itself is to address something that the operator had not addressed themselves. Had they attended to this and put out the smoking, the smoldering fire that Inspector Crick described in detail, with the strong smell of sulfur or burning coal, if they had attended to this, they wouldn't have received a K order. Explain to me a little bit more. What does it mean that an order is in place for six months? What's happening over that six months? That's another important point. I'm glad you raised that, Judge Pillard. A K order is frequently modified, sometimes on a daily basis, the conditions. It may have been in effect for six months, but I don't know the details, but I'm guessing that it was not, in effect, a closure order, not allowing them to work on that coal pile for six months. I do believe, even though it's not in the record, that there was a post-history after this event on that coal pile, which is not relevant to deciding this case, but may be relevant to answering your question, because the K order may have remained in effect because of other things going on in that coal pile after this incident. So it isn't necessarily closure at some kind of supervisory level? It can be closure, and then it can be modified to something else. We're going to allow you now to open it, and you, Judge Pillard, made reference to that fact, that unlike an imminent danger order, and this was not an imminent danger and should not have gotten an imminent danger, but unlike an imminent danger order, a K order is very flexible. It gives the secretary, through his inspectors, the right to tailor the remedy and then to change it as he sees fit. And what would be a low-level kind of remedy that might... Well, the K order stays in effect, and they tell them, I want you out there every morning at 9 o'clock surveying for smoke, and if you see any, to direct hoses or to use a rake, whatever method they want to use to alleviate that problem. But he can design what he wants. In effect, the secretary is taking control for the protection of human life. And do they do that kind of thing? Absolutely. Sort of low-level supervisory presence? Absolutely. They modify K orders all the time. So I don't know the particular details in this instance. Can you help me understand the statute here? I know the secretary has chosen to argue this in terms of this is a mine fire, but I would have thought a better ground would be to argue that it's an accident, and obviously the secretary chose not to do that. Maybe I'm missing something about the statute. You know, it's a very interesting theory, and I looked at the Section 3K definition of accident, and it says includes. So you're absolutely correct, Judge Berger. That would be a far more expansive view. And we'd be here arguing in great detail that this unique theory of accident, which is not one of the specified things such as fire, should not now be adopted as a type of an accident. The truth is we didn't feel we needed to go that route because we had one that applied, namely a mine fire. And what about ignition? How do you understand that? You mean the process that you're asking counsel? No, isn't that one of the things in the accident definition? Oh, you mean the ignition? Yeah. You know, when you're mining at the face, the face gives off. It's more sparks. You're talking more about sparks. Exactly. And the face gives off a lot of methane gas, and those sparks create pops. Sometimes it's more than a little pop, and that's considered an ignition. And that can cause a fire if you're not ventilating properly and keeping rock. This is underground mine I'm talking about. And here, I know the definition of mine is quite broad, but whatever definition applies here would also be the definition that would apply underground. That is correct. So in some sense, this is really great facts for Amcoal because this is a more benign situation in which smoldering might occur. There are other situations which would be. Yeah, and keep in mind, Judge Pillard, that a coal mine, and especially an underground mine, is a containment of fuel. That is what coal is mined for no other reason than to burn. It's extremely flammable. It's extremely dangerous. And these men and women that work in those underground coal mines every day do things that most of us would not be willing to do. Their families don't know if they're coming home each night. We have an obligation to make sure that they're as safe as possible. My time's up. I can talk more if you'd like, or I can sit down. Thank you. Thank you. Don't take that personally. All right. Mr. Hardin, we used up all of your time, so we'll give you two minutes. Okay. Thank you very much. I just have a couple of quick points in rebuttal to the statements by Mr. Feingold. First, I'd like to start where he ended off about the circumstances here being a good pattern for AmCoal. I would say that they pose an interesting question, and that is that there was gradual self-heating of coal over an extended period of time versus what you traditionally think of as a sudden event that's an accident. And the question is, is the rulemaking by adjudication process that is ongoing here, is it the thoughtful process that should be applied for such a far-reaching issue? As Commissioner Young mentioned in dissent, and this is the Chevron Step 2 question, is that we still don't know. The Secretary has never said or produced any material about where the definition came from, what it means, or how it will or should be applied. This has been the Secretary's position since at least Feldstaff's Tyrone, hasn't it? It was in that case, Your Honor. It didn't relate to Section 103K. It related to a Part 50 regulation. It was an interpretation of fire in that case. But the question is, how has it been applied in the field, and has it been applicable to Section 103K? And I would say that, again, we know of no instances, and the Secretary hasn't claimed any, over 30 years of enforcement of the Mine Act where pre-combustion smoking or smoldering on a stockpile a Section 103K order was issued. Let me ask you, Mr. Harden, about your substantial evidence position. I think that you said in your argument in chief that your response to the evidence that the Secretary put forth was basically that they haven't made their prima facie case. That's correct. So the notion that there's not substantial evidence is if we look at everything that Mr. Crick testified, everything that was in the record and that the ALJ relied on, just as a matter of what, it's just not enough. Well, that's correct because all the evidence that exists are the pictures, which you've looked at, and Inspector Crick's opinion that it could burst into flame at any moment. Again, inspectors, they have access to heat guns and forward-looking infrared cameras to take temperature readings. That wasn't done. No carbon monoxides was detected, no flames, no illumination. It's undisputed. None of those things were seen. So if we allow that to be substantial evidence, then, again, it will simply be where there's smoke, there's fire is all that's really required, and that that's the way it will be applied by administrative law judges as well as inspectors. And my last point would be on the, you were talking about, is the 103K a closure order, Judge Pillard, and the statute calls it it's a control order, and no activities can occur without MSHA's preapproval. That's what Section 103K allows, and how is it applied in the field. And finally, I think this goes to Judge Griffith, one of the questions you were asking, Mr. Feingold, there are other remedies available under the Mine Act other than a 107A and a danger order and a 103K control order for pre-accident conditions, something that doesn't quite rise to the level of an accident. I mean, the Mine Act is very detailed on this. There are hundreds of mandatory safety and health standards where MSHA and its inspectors can issue 104A citations. If a mine operator fails to abate those conditions, they can issue a 104B withdrawal order. Again, these are all pre-accident, preeminent danger. There can be a Section 104D unwarrantable failure citation and order, given the right circumstances for more egregious conduct or more serious conditions. And they also, MSHA inspectors can come and provide training and guidance as well. So there are a number of options available. Thank you. If there's no further questions. Thank you, Mr. Harden. Thank you, counsel. The case will be submitted.
judges: Brown, Griffith, Pillard